CHARLES J. ABBOTT *versus* CITY OF BANGOR.
CALEB HOLYOKE & al. *versus* SAME.

The statutes of this State, as they existed in 1865 and 1866, taken in connection with the Act of Congress of June 3, 1864, c. 106, §§ 40 and 41, did not authorize the assessors of a city or town, in which a National Bank was located, to assess taxes for State, county and municipal purposes, upon the stocks of such bank owned by non-residents.

ON REPORT.
ASSUMPSIT.
The facts are stated in the opinion.

*C. J. Abbott, pro se.*

*A. W. Paine,* for the defendants, elaborately argued the following propositions.

1. Stocks of National Banks are taxable. U. S. Stat. at

Large, 1864, c. 106, § 41.  "Place" signifies *tax district* within which the bank is situated.  Opinion of Judges, 53 Maine, 594; *First National Bank of Portsmouth* v. *Portsmouth,* not yet published; *Utica* v. *Churchill,* 33 N. Y., 161; *People* v. *Com's.,* 35 N. Y., 423.  The theory and policy of our whole tax law conforms to this construction.  The discussions in Congress conclusively lead to the same conclusion.  Cong. Globe, part 3, session 1863–4, 1957–9, 2207, 2451, 2622 and 2639.

If such is not the construction, where can holders of stock residing out of the State be taxed?

2. The Act of Congress is constitutional.  Cases before cited are based upon its constitutionality.

3. The Act of Congress binds the assessors.  Congress does not make laws for Legislatures to reënact, nor laws which depend on State laws to effectuate.  A supreme government, acting within the scope of its powers, is not obliged to wait on an inferior jurisdiction for the enactment of rules to make its laws effectual.

In all national affairs, the laws of Congress act directly on individual citizens, and not alone on States.  We are all citizens of the United States first, — of our States after that.

The National Bank Act, in all its provisions, is a national affair, and is binding upon the officers to whom it has delegated the rules for the government of the taxation.

Congress intended that the assessors should, without any enabling Act of the State, exercise the power of assessing taxes on the stock as prescribed.  Uniformity in the several States was necessary.  It was not limited to one State, but extended to all.

Had Congress intended to give the State a right to tax the stock when they chose to do so, the special and detailed provisions of §§ 40 and 41 would have been unnecessary.

Our State law makes bank stock taxable and gives the rules for taxation, — one of which requires it to be assessed at the residence of the owner.  This rule has been superseded by the paramount law of Congress, simply by chang-

ing the *place* of assessment. The assessors virtually act under R. S., simply changing the *place* of taxation in accordance with the law as it reads in its totality after the Act of Congress is effective. Hence the peculiar phraseology of the Act, — "nothing shall be construed to prevent," &c. As if it had provided that the stock shall be taxed according to the laws of the State, save in this, viz., — it shall be taxed in the "place," &c.

These views are sanctioned by authority. *Sinnot* v. *Davenport*, 22 How., 227; *Hamilton* v. *Dudley*, 2 Pet., 526; 1 Abbott's U. S. Digest, 528 § 55.

Congress has power to enact laws bearing directly upon the citizen, as in this case upon the assessors. *McCullock* v. *Maryland*, 4 Wheat., 316, 403; *Rhode Island* v. *Mass.*, 12 Pet., 657, 721; *U. S.* v. *Fisher*, 2 Cranch, 358; *Prigg* v. *Penn.*, 16 Pet., 539; *North Carolina* v. *Maryland*, 4 Wheat., 316, were also cited.

BARROWS, J.—The plaintiffs in the above entitled cases are inhabitants respectively of Castine and Brewer, and own stock in certain National Banks located in Bangor. Thus situated, in 1865 and 1866, they paid, under protest, taxes assessed upon that stock against them, for State, county and municipal purposes, by the assessors of Bangor, and now claim, in these actions, to recover back the sums thus paid.

One and the same question is presented in both cases.

Could the assessors of towns and cities in which National Banks, established under the authority of an Act of Congress, were located, rightfully assess State, county and municipal taxes upon stock in such banks, owned by parties resident in other towns or cities within this State, as the law stood in the years above named?

If not,—the plaintiffs, here, are respectively entitled to judgment, as on a default, for the sums specified in these reports, which present no other question to us for decision.

This species of property is manifestly included in the description of *personal* taxable estate, given in R. S. c. 6, § 5.

By § 10, c. 6, of the R. S., it is provided that all personal property, except in certain enumerated cases, not embracing property situated like these stocks, shall be assessed to the owner in the town where he is an inhabitant, on the first day of April in each year.

Unless these provisions of our own statutes are controlled by an Act of Congress of paramount authority, the stock owned by the plaintiffs could rightfully be assessed to them, for State, county and municipal purposes, at the places where they respectively resided at the time of the assessment, and not elsewhere. Under and by virtue of these provisions, Bangor would have no power to assess and collect such tax as against these plaintiffs.

But it is claimed and elaborately and ingeniously argued by the learned counsel for the defendants, that §§ 40 and 41 of the Act of Congress of June 3, 1864, (to provide for the national currency and for the organization of national banking associations,) not only override our statute as to the place where taxes on this kind of property shall be assessed, but are in and of themselves mandatory to assessors of taxes for State, county and municipal purposes, and *require* them to assess taxes for these purposes upon all shares in National Banks located in their municipalities, irrespective of the residence of the owners of the shares.

It cannot be so. The very nature of the power and objects of taxation, aside from the language of the Act of Congress, which is plainly permissive and not imperative, forbids such a construction.

Montesquieu, in his Spirit of Laws, Book xiii., c. 1, thus happily defines the object and true principles of taxation : — " The revenues of the state are a portion that each subject gives of his property, in order to secure or to have the agreeable enjoyment of the remainder. To fix these revenues in a proper manner, regard should be had to the necessities of the state and to those of the subject."

The duties, for the performance of which we look to the Federal Government of these independent but united states,

are those pertaining to the common defence and general welfare of the country as a whole, embracing all the States and territories under its jurisdiction. Its necessities for a revenue arise from the performance of these, its appropriate functions and duties. Beyond guarantying to the citizens of the several States the maintenance of a republican form of government by all the States composing the Federal Union, it has no concern with the administration of justice under local laws, and no one expects it to provide means for defraying the expenses of the various counties and municipal corporations into which the States are subdivided.

Accordingly, we find conferred upon Congress by the Constitution of the United States, not an unlimited and indefinite and absolute power to levy and collect taxes, duties, imposts and excises for any and all purposes whatsoever, but to enable them effectually to exercise the powers specifically granted by the several States to the general government, it is provided, (Art. 1, § VIII) that "Congress shall have power to lay and collect taxes, duties, imposts and excises, *to pay the debts and provide for the common defence and general welfare of the United States.*"

It is not within the scope either of their duty or their authority, in the loyal and well ordered State of Maine, to provide by taxation the means of defraying the expenses of those municipal corporations which owe their existence to an independent State government, or to furnish the proportional part which those municipalities are bound to contribute towards the expenses of the county or State in which they are situated. Nor is there anything in the language of the Act of Congress of June 3, 1864 indicating that they designed or undertook to do it. To guard against the assumption that they intended to exempt entirely the shares in these banking associations, which they had created to meet a financial exigency of the general government and the country at large, from taxation under State authority for State and municipal purposes, they simply say, in § 41, that "*nothing in this Act shall be construed to prevent all*

the shares in any of said associations, held by any person or body corporate, from being included in the valuation of personal property of such person or corporation *in the assessment of taxes imposed by or under State authority, at the place where such bank is located and not elsewhere,* but not at a greater rate than is there assessed upon other moneyed capital in the hands of individual citizens of such State."

An unlimited power to tax being in effect a power to prohibit or destroy, Congress seems to have considered it necessary and proper to place such limitations upon the concurrent authority of the individual States to tax these shares, as would preclude them from imposing such unequal burdens upon this species of property as might prevent investment therein, and this was accordingly done by various provisos similar in character and design to the one above recited. Under these limitations the matter of taxation, by or under State authority, is left open to the action and effect of State legislation. Where the general tax laws of the State permitted the assessment of these shares and conformed to the restrictions imposed by the Act of Congress, no further action on the part of the State Legislature was necessary. Nothing in the Act of Congress was to be construed *to prevent* such assessment. But it was equally foreign to the design of Congress so to intervene in the matter of the assessment of taxes by or under State authority, as *to require* such assessment, or to change or control the effect of any State law, by virtue of which it must be made (if made at all) for State and local purposes.

Congress had an unquestionable right to establish these associations, and to give them such privileges as were necessary to enable them to fulfil the great public purposes of their organization. They had a legal existence in this State, the Act of Congress establishing them being of paramount authority to the statutes of this State, (R. S., c. 47, §§ 79, to 82, inclusive,) by which private, associated, and foreign banking are prohibited except when specially authorized by the Legislature. But the liability of the shareholders in

them, to taxation for State, county and municipal purposes, must depend upon State legislation, which is found to be not in contravention of the limitations imposed by Congress. By the law, as it stood in 1865 and 1866, taking our own general tax law, with the limitations superadded by the Act of Congress for our guide, it appears that, while shares in these associations, held by inhabitants of *the place where the bank was located* might be legally assessed, there was an utter failure of legal authority to tax the shares belonging to persons who resided *elsewhere* within this State.

With the apparent inequality resulting from this state of the law, it is the province, not of the judiciary, but of the law making power to deal. It is not the *first*, it will not probably be the *last* instance in which property by reason of its peculiar situation escapes taxation.

*Defendants defaulted.*

APPLETON, C. J., CUTTING, KENT and DICKERSON, JJ., concurred.

DANFORTH, J., concurred in the result.